UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| THE CITY OF NEW ORLEANS, | * | CIVIL ACTION NO. 08-3949 |
| Plaintiff | * | |
| | * | SECTION "N" (1) |
| VS | * | |
| | * | JUDGE ENGELHARDT |
| AMBAC ASSURANCE CORPORATION, | * | |
| AMBAC FINANCIAL SERVICES, LLC, | * | MAGISTRATE SHUSHAN |
| PAINEWEBBER CAPITAL SERVICES, | * | |
| INC., and UBS SECURITIES, LLC, | * | |
| Defendants | * | |

**MEMORANDUM IN SUPPORT OF MOTION FOR RECONSIDERATION
BY PAINEWEBBER CAPITAL SERVICES, INC. AND UBS SECURITIES, LLC**

On October 14, 2010, the Court granted PWCSI and UBS's (collectively, the "UBS Defendants") motion to dismiss the City's claims for breach of the Remarketing Agreement, unjust enrichment, and tortious interference. *See* Dkt. No. 107.[1] The Court declined to dismiss the City's claims for breach of the Swap, fraudulent inducement, and negligent misrepresentation, noting that the interpretation of the transfer provision in the Swap "bears further briefing." Tr. 55:21. The UBS Defendants provide that briefing here, and respectfully submit that this case should be dismissed in its entirety with prejudice.

**<u>INTRODUCTION</u>**

The City's claim for breach of the Swap is based entirely on its assertion that the Swap's § 7(a)(iii) required PWCSI to give the City notice of the Reciprocal Swap. *See* Opp. at 14 ("The premise of the City's claim for Breach of the Swap Agreement is simple: PWCSI never gave

---

[1] Capitalized terms have the same meanings as in the UBS Defendants' memorandum ("Mem." or "Memorandum") in support of the motion to dismiss the Complaint [Dkt. No. 92]. All citations to "¶ __" refer to the numbered paragraphs in the Complaint.

prior written notice to the City of its Reciprocal Swap, and has thus breached the clear terms of Section 7(a)(iii)(2).”); Tr. 55:17-20 (“While the City's consent may not have been required to transfer the Swap under the Contract, according to my reading of Section 7 at this point written notice to the City might have been required.”).  But by its clear language, § 7(a)(iii) does not apply to the Reciprocal Swap because it requires notice only of transfers of the entire Swap and "***all***" the party's "***rights and obligations***" under the Swap to an "[*a*]*ffiliate*" of Ambac:

> (iii) a party may transfer **this Agreement** and **all** of its **rights and obligations** hereunder with respect to any or all Transactions to any of its Affiliates or to **any Affiliate of the PWCSI Surety Provider without the consent of the other party** provided that the other party is furnished with (A) an agreement in writing of any Credit Support Provider- of the transferor that any Credit Support Document will continue to apply to the obligations of such transferee under this Agreement after such transfer, or (B) a financial guaranty comparable to the PWCSI Surety Bond provided by a financial guarantor with credit ratings no lower than those of the PWCSI Surety Provider **and that no such transfer may occur unless the following conditions shall have been met**:

> (1) the **transferee accepts and assumes all of the transferor's obligations** under this Agreement and any Transaction being transferred;

> (2) the transferring party **shall give the other party and the PWCSI Surety Provider prior written notice** of any transfer of the Agreement or any Transaction . . . .

App. 275 (emphases added).[2]  The plain terms of this provision apply only to transfers meeting three requirements: (1) the transfer must be of “rights and obligations” under the Swap; (2) “all,” not just some, of those rights and obligations must be transferred; and (3) the transferee must be an Ambac “affiliate.”  Simply put, the Reciprocal Swap meets none of these requirements because, like the Swap itself, the Reciprocal Swap is simply a hedging mechanism that PWCSI used to minimize its exposure to the variable interest rate risk on the Bonds.  Tellingly, the City

---

[2] The full text of § 7 is attached hereto as Exhibit A.  Section 7 also appears at App. 274-76.

never cites a single obligation PWCSI transferred in the Reciprocal Swap, which alone means § 7(a)(iii) does not apply.

That the Reciprocal Swap did not transfer the Swap and **all** PWCSI's rights and obligations is the only conclusion consistent with the Court's correct holding that the City is not in contractual privity with Ambac and AFS. *See* Tr. 51:7-9. Such privity would exist had there been the kind of wholesale transfer covered by § 7(a)(iii). And since notice was not required under § 7(a)(iii), then it was not required at all because that is the only notice requirement in the transfer provisions of the Swap. *See* App. 274-76.

None of these points raises issues of fact, and all of them are clear from the documents this Court has taken judicial notice of in deciding the motion to dismiss. *See* Tr. 4:21-5:9. Moreover, the interpretation of the Swap is a legal issue for the Court, as it recognized during the hearing. Tr. 55:1-2. The UBS Defendants respectfully submit that the Court's interpretation of § 7 of the Swap is a manifest error of law, and the City's claim for breach of the Swap should be dismissed.

The City's claims for fraudulent inducement and negligent misrepresentation also should be dismissed because, among other reasons, as the Court itself explained in its oral ruling, the City was well aware of each of the facts it alleges were not disclosed. In granting Ambac's motion to dismiss those claims, the Court held that the City (1) "knew that PWCSI may enter [in]to a Reciprocal Swap Agreement with AFS," Tr. 48:22-23; (2) "was well aware of the risks of the structure" of the Bonds, Tr. 49:5-8; and (3) "had all the information at its disposal to evaluate any" conflicts of interest, Tr. 49:17-19. These holdings about what the City knew cannot be simultaneously true for Ambac and untrue for UBS and PWCSI. In other words, the City cannot have been aware of these facts (for claims against Ambac) and unaware of them (for

3

claims against UBS and PWCSI) at the same time.  The City's claims for fraudulent inducement and negligent misrepresentation against UBS and PWCSI thus fail for the same reasons its claims fail against Ambac.  To allow its claims to proceed against UBS and PWCSI would be a manifest injustice and a manifest error of law.[3]

## **STANDARD**

Courts in the Fifth Circuit generally evaluate a motion for reconsideration using the standards of Rule 59(e) if the motion is filed within the time prescribed by Rule 59, that is, 28 days after the entry of the order. *See, e.g.*, *Voisin v. Tetra Techs., Inc.*, No. 08-1302, 2010 WL 3943522, at *2 (E.D. La. Oct. 6, 2010).  A Rule 59(e) motion may be granted on four grounds: "(1) to correct manifest errors of law or fact upon which [the] judgment is based; (2) the availability of new evidence; (3) the need to prevent manifest injustice; or (4) an intervening change in controlling law." *Id.*; *see also, e.g.*, *Castrillo v. Am. Home Mortgage Servicing, Inc.*, No. 09-4369, 2010 WL 1424398, at *4 (E.D. La. Apr. 5, 2010).  The UBS Defendants' motion should be granted to correct manifest errors of law and to prevent manifest injustice. *See, e.g.*, *Williamson Pounders Architects, P.C. v. Tunica County*, No. 2:06CV206, 2008 WL 2856826 (N.D. Miss. July 21, 2008) (granting motion to reconsider denial of motion to dismiss on breach of contract claim).

---

[3] Furthermore, the City conceded in its Opposition that the Swap's fiduciary disclaimer and non-reliance clauses barred its fraud and misrepresentation claims against PWCSI, *see* Opp. at 28; it would thus be a manifest injustice and a manifest error of law to allow those claims to proceed against PWCSI even if the claims proceed against UBS.

## ARGUMENT

**I.     The City Fails to State a Claim for Breach of the Swap (Count VIII)**

**A.     The Unambiguous Language of the Swap Did Not Require PWCSI to Give "Prior Written Notice" of the Reciprocal Swap**

Section 7(a)(iii) covers a party's "transfer [of] *this Agreement* and *all of its rights and obligations* hereunder . . . to any *Affiliate* of [Ambac]." App. 275 (emphases added).  The plain terms of this provision apply only to transfers meeting three requirements: (1) the transfer must be of "rights and obligations" under the Swap; (2) "all," not just some, of those rights and obligations must be transferred; and (3) the transferee must be an Ambac "affiliate."  The Court may interpret the contracts' unambiguous language as a matter of law.  *See, e.g.*, *Delta Catering Mgmt., LLC v. Universal Sodexho (USA), Inc.*, No. 08-4799, 2009 WL 1870894, at *1 (E.D. La. June 29, 2009); *Jackson v. Capitol City Family Health Center*, 928 So. 2d 129, 131-32 (La. App. 1st Cir. 2005).  Under that plain language, notice was not required of the Reciprocal Swap, including its § 10.

1.     Section 7(a)(iii) Does Not Apply to the Reciprocal Swap Because the Reciprocal Swap Did Not Transfer "Rights and Obligations"

Section 7(a)(iii) of the Swap does not apply to the Reciprocal Swap, including § 10, because the Reciprocal Swap was not a transfer of rights and obligations under the Swap.  To understand why the Reciprocal Swap as a whole did not transfer any of PWCSI's rights or obligations under the Swap, it is crucial to understand the basic rights and obligations of the parties under the two swaps, which are undisputed and clear from the documents and the City's factual allegations.  As the City explains, the Swap allowed the City "[t]o hedge (really to insure against) its exposure to the 15% maximum variable interest rate on the Bonds."  ¶ 1 at 6.  To effect that hedge, the City pays to PWCSI a fixed 6.95% interest rate, and PWCSI pays to the City the variable rate owed on the Bonds.  *See id*; ¶ 66; App. 287.  Furthermore, if the Swap is

terminated early, either the City pays to PWCSI or PWCSI pays to the City a settlement amount that relates to the difference between the fixed and variable rates over the unexpired term of the Swap. *See* ¶ 69. The Swap also includes a number of other provisions to facilitate the payments and protect both parties, but the payments constitute the Swap's fundamental purpose, namely, the hedge. In turn, the Reciprocal Swap is, as the City alleges, almost the mirror image of the Swap, ¶ 86, and, like the Swap, was used by PWCSI to hedge (minimize) its exposure to the variable interest rate risk.

The key to seeing that the Reciprocal Swap was not a transfer of rights or obligations is that both PWCSI and the City still must pay each other under the Swap. Had the Reciprocal Swap constituted a transfer of the Swap "Agreement and all of [PWCSI's] rights and obligations [t]hereunder," Ambac would have assumed PWCSI's role. PWCSI would no longer be obligated to pay the City under the Swap and would no longer have the right to receive payment from the City under the Swap. But that is not the case. PWCSI, not Ambac, exclusively is paying the City, and the City is receiving payments exclusively from PWCSI, not Ambac. The City recognizes that only the parties to the Swap are obligated to pay and receive payments, noting that PWCSI and the City are in fact still paying each other. *See, e.g.*, ¶ 122. Similarly, if AFS breaches the Reciprocal Swap by failing to pay the variable rate to PWCSI, that would not relieve PWCSI of its obligation to pay the variable rate to the City. Indeed, it has long been recognized that, under "reverse" or "mirror" swaps like the Reciprocal Swap, "[t]he rights and obligations under the original swap are not extinguished." Mark D. Young & William L. Stein, *Swap Transactions Under the Commodity Exchange Act: Is Congressional Action Needed?*, 76 Geo. L.J. 1917, 1934 (1988).[4]

---

[4] *See also* Christopher Dean Olander & Cynthia L. Spell, *Interest Rate Swaps: Status Under Federal Tax & Securities Laws*, 45 Md. L. Rev. 21, 35 (1986) ("In the mirror swap transaction, the original interest rate swap

The Court's verbal ruling on this Count VIII with respect to Ambac further confirms that the Reciprocal Swap did not transfer the Swap and all PWCSI's rights and obligations: "The City cannot assert a breach of [the Swap] against AAC or AFS since they're not parties to that agreement." Tr. 51:7-9. Had PWCSI transferred the entire Agreement to AFS, AFS would have been a party to that agreement, as the City itself argues and as § 7(a)(iii) itself contemplates. *Cf.* Opp. at 19 (citing case for the proposition that "in an assignment of a party's interest in a swap agreement, 'a third party [is] *substituted* for one of the original two counterparties.'" (alteration in original) (emphasis added)); *see* Swap § 7(a)(iii)(1), App. 275 (requiring that "the transferee accepts and assumes all of the transferor's obligations under this Agreement and any Transaction being transferred"). In other words, there is no privity between Ambac/AFS and the City:



Thus any allegation of a transfer of rights or obligations to AFS is contradicted by what the transaction documents actually provide. At most what the Reciprocal Swap transferred was PWCSI's *risk* under the Swap. But interest-rate risk is not a right or obligation under the Swap and therefore is not subject to the transfer provisions in § 7(a). Both PWCSI and the City

---

remains untouched and the borrower desiring 'out' continues its obligations under it."); Eugene Y. Ferrer, *Tax Treatment of Interest Rate Swaps at Disposal: Should Swap Participants Have Their Cake and Eat It Too?*, 26 U.S.F. L. Rev. 283, 292 (1992) ("Under a 'reverse swap,' the original interest rate swap remains undisturbed . . . ."); Patricia Brown, *Tax Consequences of Interest Rate Swaps: Characterization by Function, Not Prejudice*, 6 Int'l Tax & Bus. Law. 122, 165 (1988) ("[T]he [swap] party can, in effect, neutralize its original swap, *without affecting the obligations themselves*, by entering into a 'reverse' swap with a third party." (emphasis added)).

protected themselves against the risk of rising interest rates.  PWCSI's insuring itself against that risk with the Reciprocal Swap no more constituted a transfer of PWCSI's rights and obligations under the Swap than the Swap constituted a transfer of the City's rights and obligations vis-à-vis the bondholders.  Just as the City is still obligated to the bondholders, PWCSI is still obligated to the City.  The City never claims that it transferred its obligations to the bondholders to PWCSI under the Swap, or that PWCSI has an obligation to pay the bondholders the interest on the Bonds.[5]  In fact, the City's obligation to pay bondholders the variable rate on the Bonds is unaffected by the Swap—*i.e.*, the City must pay the variable rate set in the remarketing regardless of what happens with the Swap.  Moreover, the City's risk did not change at all with the Reciprocal Swap in place.  After the Swap, the City no longer bore the variable interest rate risk; and after the Reciprocal Swap, the City still does not bear that risk—the City's risk is unaffected because it had already been transferred away from the City via the Swap.  Simply, the Reciprocal Swap did not result in the transfer of PWCSI's rights or obligations under the Swap.

The Reciprocal Swap's § 10 does not alter this conclusion.  There, PWCSI agreed that it would not exercise certain rights under the Swap without Ambac's consent and that it would exercise certain rights at Ambac's direction:

> (i) PWCSI shall not exercise any option, set any rate, direct or request any action, calculate any termination value or give any consent with respect to the [Swap] without the prior written consent of ***Ambac*** Assurance Corporation.

> (ii) PWCSI shall exercise any option, set any rate, direct or request any action or give any consent with respect to the [Swap] at the direction of ***Ambac*** Assurance Corporation.

App. 300 (emphases added).  Section 10 merely gave Ambac the right to dictate when PWCSI would or would not exercise certain of PWCSI's rights under the Swap.  It did not relieve

---

[5] Technically, the City pays a trustee, which in turn pays the bondholders; but the details of these mechanics are not important for purposes of the City's claims or this motion.

PWCSI of its obligations nor did it diminish any of PWCSI's rights under the Swap.  Even after the Reciprocal Swap, PWCSI has the right to exercise options, set rates, etc. vis-à-vis the City, and Ambac cannot unilaterally change anything under the Swap.  If PWCSI exercises an option absent Ambac's consent or fails to exercise an option at Ambac's direction, PWCSI may breach the Reciprocal Swap, but that has nothing to do with the City or either the City's or PWCSI's rights or obligations under the Swap.  As the Court held, the City is not in privity with Ambac.[6]

> 2.  Even If the Reciprocal Swap Transferred Some Rights or Obligations, It Did Not Transfer "All" Rights and Obligations

Even if the Reciprocal Swap, as a whole or in § 10, could be construed as transferring some rights or obligations (which it did not), it did not transfer "*all*" rights and obligations, as is necessary for § 7(a)(iii) to apply.  App. 275.  As explained above, PWCSI retains all its rights and obligations under the Swap—PWCSI pays and receives interest from the City, and PWCSI may exercise options.  So, whatever the Reciprocal Swap may have transferred, it did not transfer these particular rights and obligations.

Moreover, neither in the Complaint nor in its Opposition does the City cite a single one of PWCSI's Swap *obligations* that PWCSI transferred.  The City pleads only that the Reciprocal Swap transferred PWCSI's "power," "control," or "rights":

- "PWCSI secretly entered into a Reciprocal Swap with Ambac's wholly owned affiliate, AFS, by which PWCSI transferred all of its *rights* under the Swap to Ambac (sole member of AFS)."  ¶ 1 at 6 (emphasis added).

---

[6] The City and Ambac/AFS would have been in contractual privity had PWCSI transferred or assigned all its rights and obligations under the Swap to Ambac.  Tr. 51:7-9; *cf.* Opp. at 19 (citing case for the proposition that "in an assignment of a party's interest in a swap agreement, 'a third party [is] *substituted* for one of the original two counterparties'" (alteration in original) (emphasis added)).

- "Pursuant to PWCSI's Reciprocal Swap agreement with AFS, AFS provided for PWCSI to transfer effectively all of its **control** under the Swap to Ambac."  ¶ 90 (emphasis added).

- Alleging "transfer of **power** to Ambac."  *Id.* (emphasis added).

- "Given the transfer of **power** under the Swap to Ambac . . . ." ¶ 91 (emphasis added).

- "Pursuant to PWCSI's Reciprocal Swap agreement with AFS, AFS provided for PWCSI to transfer effectively all of its **rights and options** under the Swap to Ambac." ¶ 182 (emphasis added).

- Alleging "fail[ure] to provide prior notice to the City of the transfer of **rights and options** to Ambac and AFS."  ¶ 183 (emphasis added).

Yet, without a transfer of "all" PWCSI's obligations to AFS, let alone a single one, the unambiguous language of § 7(a)(iii) cannot apply.

Section 10's plain language also shows that it transfers none of PWCSI's obligations and, to the extent § 10 is construed to transfer rights, it does not transfer all of PWCSI's rights. Exercising options, setting rates, directing actions, etc. cannot possibly be construed as obligations.  And the rights mentioned in § 10 do not cover all of PWCSI's rights under the Swap—PWCSI still has the right, for instance, to receive payments under the Swap.

      3.      Section 10 of the Reciprocal Swap Is Not a Transfer to an "Affiliate" of Ambac

Even if § 10 of the Reciprocal Swap were a transfer of all rights and obligations (which it is not), § 7(a)(iii) still would not apply because § 10 would be a "transfer" to **Ambac** itself, not an "[a]ffiliate" of Ambac.  The logic of the notice provision itself shows that it does not apply to § 10.  Subsection (2) of Swap § 7(a)(iii) provides that the transferring party not only give notice to the other party, but also requires that notice be given to "the PWCSI Surety Provider," *i.e.*,

Ambac.  App. 275.  Under the City's reading of § 7(a)(iii), PWCSI would be required to give notice to Ambac of a transfer to Ambac.  This would make no sense and merely highlights that § 7(a)(iii) is not intended to apply to transfers to Ambac itself.

Section 7(a)(iii) of the Swap, the only part of the transfer provision that requires notice to the City, is thus irrelevant to the Reciprocal Swap.  Therefore, the City's claim that PWCSI failed to provide "prior written notice" is meritless because the plain language of the contract did not require such notice under the circumstances alleged.

## B.      The City Consented to the Very Transfer of Alleged Control of Which It Complains

The City contends § 10 of the Reciprocal Swap transferred some rights, but no obligations, to Ambac—not to AFS.  Specifically, it complains that the Reciprocal Swap put Ambac in control of PWCSI's actions with respect to the Swap.  *See, e.g.*, ¶ 90 ("This transfer of power to Ambac effectively put Ambac in control of PWCSI, who can only act or refrain from acting at Ambac's direction or consent.").  But in § 7(c) of the Swap, the City "acknowledge[d] and consent[ed] to" this so-called transfer.

Section 7(c) provides: "[The City] hereby ***acknowledges and consents*** to the assignment by PWCSI to [Ambac] of any rights and remedies that PWCSI has under any Insured Transaction or any other document executed in connection herewith."  App. 276 (emphasis added); *see* Mem. at 20.  In other words, the City both acknowledged and consented to the very "transfer" that forms the basis of its complaint regarding the Reciprocal Swap, namely, that the Reciprocal Swap allegedly transferred control of the Swap to Ambac.  Therefore, the City has no right to complain about Ambac's alleged "control" or any alleged breach of the Swap.

1.     The Acknowledgement-and-Consent Provision of § 7(c) Is Not Limited to Subrogation

The City argues that the final sentence of § 7(c) is limited "to a transfer of PWCSI's rights to Ambac as a result of the latter's subrogation to PWCSI."  Opp. at 13.  This construction ignores the plain language of § 7 and also would produce irrational results.

a.     The City's Interpretation Violates the Contract's Plain Language

The acknowledgement-and-consent sentence is a general consent to assignments to Ambac and is not limited to the event of subrogation.  Reading the entirety of § 7(c) makes this clear.  In the first sentence, the City "acknowledges" that Ambac is "subrogated to the rights of PWCSI" "***to the extent*** of payments made by [Ambac] under the [surety bond]."  App. 276 (emphasis added).  And in the next sentence, PWCSI agrees to assign "its right to receive payment" from the City "under any Insured Transaction ***to the extent*** of any payment thereunder."  *Id.* (emphasis added).  But the final sentence of § 7(c) does not contain such limiting language; it instead operates as a catch-all that acknowledges PWCSI's assignment of "any rights and remedies that PWCSI has under" the Swap.  *Id.*  The first two sentences show that the parties knew how to limit provisions to subrogation when they so wanted.  The fact they did not use this language in the final sentence shows they did not want to restrict it similarly.

At oral argument, the City contended that the consent sentence must be restricted to the situation of subrogation only, despite the absence of any language in that sentence indicating as much, because it would be too difficult a drafting job to include such language: "you can[not] divorce the consent clause of Section 7(c) of the Swap from the two preceding sentences" because to do so, "you [would have to] write a sentence of some 15 or 16 lines long that would have all of the conditions preced[ent] and all the subrogation language[, etc.] . . . but that would be pretty bad English."  Tr. 36:16-23.  But the first two sentences of § 7(c) show why this is

wrong.  Just as those sentences include language limiting them "to the extent" of payments made by Ambac, the final sentence could easily include identical language: "To the extent of payments made by Counterparty Surety Provider to PWCSI under the Counterparty Surety Bond, Counterparty hereby acknowledges and consents to the assignment by PWCSI to Counterparty Surety provider of any rights and remedies that PWCSI has . . . ."  That is simple and clear, but that is unequivocally not what was written.[7]  The parties could have entered a contract restricting the City's consent to the event of subrogation, but that is not the contract they entered.[8]

The City mistakenly seems to view § 7(c) as if it had a heading "Subrogation."  But there is no reason to view § 7(c) as a subrogation provision instead of a provision covering rights of the surety bond provider (Ambac).  To be sure, the first two sentences do refer to subrogation.  But they also refer more broadly to Ambac's rights.  And, the final sentence says nothing about subrogation but plainly addresses Ambac's rights without any limiting language whatsoever.  As the City claims and the Court recognized, Ambac understandably took considerable steps toward protecting its rights in the transaction.  *See* ¶¶ 36-39 (describing Ambac's many rights in the Resolutions); ¶¶ 61-64 (describing Ambac's many rights under the Standby Agreement).  Section 7(c) serves, like these many other provisions, as a way Ambac, the surety bond provider and bond insurer, protected its interests in the transaction.

b.      The City's Interpretation Would Lead to Irrational Results

Reading § 7 as a whole shows that the City's construction not only violates § 7's plain language but also would produce irrational results.  The City concedes that PWCSI could

---

[7] Alternatively, and just as simply, the final sentence could have begun: "In the event of Counterparty Surety Provider's subrogation to the rights of PWCSI, Counterparty hereby acknowledges and consents . . . ."  In any event, the point is that the City's drafting argument is mere smoke-and-mirrors designed to distract from the fact that the City's consent was in no way limited.

[8] *Cf. Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1440 (2010) (holding that the "manner in which the law 'could have been written,' has no bearing; what matters is the law the Legislature did enact" (citation omitted)).

transfer the *entire* Swap, including all rights and obligations, to AFS as long as PWCSI provides *notice*—*i.e.*, for such complete transfers, PWCSI need not seek the City's *consent*. *See* Opp. at 14-16; § 7(a)(iii)(2), App. 275 ("a party may transfer this Agreement and all of its rights and obligations hereunder . . . to any Affiliate of the PWCSI Surety Provider [*i.e.*, Ambac] *without the consent of the other party* provided that . . . the transferring party shall give the other party . . . prior written notice" (emphasis added)).   In other words, the City has no right to reject a wholesale transfer of the Swap to AFS—the City need only be given notice of the transfer.  Yet under the City's reading of § 7(a) and § 7(c), PWCSI must seek the City's prior written consent for assignments of much less than the entire agreement to Ambac itself, who is the surety bond provider and who has numerous rights under the City's Resolutions and most of the contracts governing the Bonds.  It defies logic that the parties would impose a higher standard on grants of some rights (but no obligations) to Ambac than they would for wholesale transfers of all rights and obligations under the Swap to one of Ambac's affiliates.  This makes the City's reading of the contracts untenable.  *See, e.g.*, *Dore Energy Corp. v. Prospective Inv. & Trading Co. Ltd.*, 570 F.3d 219, 225 (5th Cir. 2009) (applying Louisiana law) ("An outer boundary in interpretation is to avoid 'unreasonable consequences or inequitable or absurd results . . . .'" (citation omitted)); *Regions Bank v. Kountz*, 931 So. 2d 506, 518 (La. App. 3d Cir. 2006) ("An interpretation of contractual language which would lead to absurd consequences must be rejected as unreasonable.").

Notwithstanding § 7(c)'s unambiguous language, the City contends PWCSI's reading "negates and makes superfluous the entirety of Section 7(a)."  Opp. at 17.  This is wrong: § 7(a) would still have effect with respect to PWCSI's assignment of rights to a party other than Ambac; and it would still have effect if PWCSI transferred the entire agreement and all of its

14

rights and obligations to an Ambac affiliate.  All § 7(c) does, under its plain language, is provide that PWCSI need not otherwise obtain the City's consent for the transfer of certain rights to Ambac, the surety bond provider on the Swap (¶ 64).  Thus, the only reasonable construction of § 7 is that both parties expressly acknowledged and consented to the assignment of rights and remedies to Ambac.

>            2.      Even If the City's Consent Relates to Subrogation, Subrogation Need Not
>                    Occur First

Even if the acknowledgement-and-consent sentence generally relates to subrogation, there is no basis for interpreting it, as the City does, to require that Ambac first be subrogated before any acknowledgement occurs.  The more natural reading of that last sentence would be that it gives the City's present consent in order to facilitate Ambac's activities as surety under the Swap.  There is nothing in the plain language of § 7(c) that even hints that the City's acknowledgement and consent will occur in the future only after subrogation occurs.  That sentence is written in the present tense and is operative the moment the Swap takes effect.

>            3.      The City's Consent Satisfies § 7's Requirements

This construction of the Swap, unlike the City's, makes sense of all the contract's terms. Section 7(a) reads: "***Except as expressly provided herein***, neither this Agreement nor any interest or obligation in or under this Agreement may be transferred . . . by either party ***without the prior written consent*** of the other party."  App. 275 (emphases added).  The Reciprocal Swap's alleged assignment in § 10 complies with this provision because § 7(c) satisfied the general transfer provision of § 7(a).

First, § 7(a) requires only the City's "prior written ***consent***."  App. 275.  In § 7(c), the Swap expressly provides that the City "***hereby*** . . . ***consents***" to PWCSI's assignment of rights to Ambac.  App. 276.  The City does not—and cannot—argue that "consent" in one paragraph has

a different meaning from "consent" in the other.

Second, the opening clause of § 7(a) has a broad exclusion for transfers "expressly provided herein."  Section 7(c) expressly provides for a transfer of rights to Ambac.  Therefore, even if the "consent" in § 7(c) is somehow not equivalent to the "consent" in § 7(a), § 10 of the Reciprocal Swap would still be valid under the Swap even accepting the City's contention that it assigned PWCSI's rights to Ambac.

At oral argument, the City argued that this opening clause does not relate to § 7(c) because the clause is in § 7(a) and not at the beginning of § 7.  Tr. 37:9-16.  The City again misreads the contract.  The word "herein" means simply "[i]n this thing" and can refer to "a document, section, or matter."  Black's Law Dictionary 744 (8th ed. 2004).  The whole of § 7 makes clear that the clause "Except as expressly provided herein" references exceptions to the "prior written consent" requirement that are expressly provided in all of § 7.  In other words, § 7(a) dictates that, other than transfers that are expressly provided anywhere in § 7, no interest or obligation in the Swap can be transferred without prior written consent.  First, restricting this clause to the transfers specified in § 7(a) (*i.e.*, the transfers in subparagraphs (i), (ii), and (iii)) renders the clause superfluous.  Section 7(a) states that no interest or obligation in the Swap may be transferred "without the prior written consent of the other party, ***except that***" and then lists subparagraphs (i), (ii), and (iii).  The transfers in those subparagraphs thus are already exempt from the consent requirement.  The opening clause of § 7(a) serves a purpose only if it exempts transfers mentioned elsewhere in § 7.

Second, if this clause did not refer to transfers provided anywhere in § 7, the "consent" sentence in § 7(c) (and, for that matter, the similar sentence in § 7(b)) would be meaningless— why would the contract state that the City "hereby acknowledges and consents to the

assignment" of rights by PWCSI in § 7(c) if § 7(a) prevents that consent from being operative? If "herein" refers only to transfers in § 7(a), then § 7(b) and § 7(c) become superfluous because the consent provided in those paragraphs cannot satisfy § 7(a) and thus serves no purpose at all. The City recognizes this by conceding that consent by virtue of § 7(c) would be effective—and thus satisfy § 7(a)—had subrogation occurred; the City simply disputes that there is no condition precedent (namely, subrogation) to the consent. But that is a different question from whether a transfer provided for in § 7(c) is valid under § 7(a).

Third, moving this clause to the beginning of § 7 would require that every other paragraph be rewritten because "Except as expressly provided herein" cannot logically preface the other paragraphs of § 7. That is, moving "Except as expressly provided herein" to the beginning of § 7 has the same effect as inserting that clause at the beginning of each paragraph (a) through (g) of § 7. So, for instance, § 7(g) would read, nonsensically, "Except as expressly provided herein, any purported transfer that is not in compliance with this Section will be void." *Cf.* App. 276. The parties would not specify that non-compliant transfers are void, but then specify elsewhere that non-compliant transfers are not void. And, indeed, no provision in § 7 saves non-compliant transfers.

In sum, even if the partial assignment in § 10 of the Reciprocal Swap is considered a transfer of rights, § 7(c) makes that assignment valid under the Swap.

**C.** **Whether the City Suffered Prejudice from the Lack of Notice is Irrelevant, But in Any Event the City's Own Allegations and the Documents Contradict Its Claim of Prejudice**

The City was not entitled to notice, but, in any event, its supposed prejudice from the alleged lack of notice has nothing to do with the Reciprocal Swap and is simply the function of hindsight. The City argues that the notice requirement of § 7(a)(iii) was designed "to give the City a chance to decide whether it wished to exercise its option to terminate the Swap at a time

that might be advantageous to the City." Opp. at 14. The City claims that the City would have terminated the Swap had UBS or PWCSI notified it in December 2000 that PWCSI was entering the Reciprocal Swap. But whether the City was "in the money" on the Swap depends exclusively on the difference between the fixed and variable interest rates, not on the identity of the counterparty. *See* ¶ 69. The City nonetheless claims that "the Reciprocal Swap gave Ambac an incentive . . . to increase the spread between the Fixed Rate and Floating Rate on the Swap." ¶ 92. But in the absence of the Reciprocal Swap, PWCSI would have the same incentive—because without the Reciprocal Swap, PWCSI would bear the risk of the variable rate. In fact, the City is in a better position when Ambac is subject to these incentives because, as the City states, "Ambac's interests are more closely aligned with the City's interests . . . because anything that increases the City's costs or exposure also increases Ambac's risk." *Id.* Accordingly, Ambac was actually less likely than PWCSI to act to increase the spread. So the fact that the City did not terminate the Swap when PWCSI was a counterparty shows that it certainly would not have terminated the Swap with AFS as a counterparty.

Furthermore, the City cannot plausibly claim that it was blind to the existence of the Reciprocal Swap with AFS or to Ambac's significant rights in the Swap. As this Court held, "[t]he City knew that PWCSI may enter [in]to a Reciprocal Swap Agreement with AFS." Tr. 48:22-23. And, as the City notes throughout the Complaint, Ambac sought to protect its insured interests, through language it included throughout the Resolutions and the Swap. *See, e.g.*, ¶¶ 29-31, 36-37, 39. The Insurance Provisions of the Swap contain many instances where Ambac controls PWCSI's and the City's ability to terminate the Swap or designate Termination Events under the Swap. *See, e.g.*, App. 269 (requiring Ambac's consent for certain early terminations); *id.* (providing for Ambac's right to designate early termination); App. 274 (noting

Ambac's beneficiary status and "entitle[ment] to enforce its rights" under the Swap).  In fact, PWCSI itself expressly consented to the City's "assignment" of its rights under the Swap to Ambac.  *See* App. 275.  Given the City's awareness of Ambac's involvement, had the City truly been so concerned about the settlement amount, it would have taken action earlier.  Of course, the City did nothing because the truth of the matter, based on the documents and the City's own allegations, is that the City reaped enormous financial benefits for eight years and is now complaining only after—and only because—its fortunes have turned.

Finally, there is no plausible reason that the City would have terminated the very document that it admits was critical to its budget predictability and its insulation from interest rate risk.  *See* Opp. at 7; ¶ 1 at 6.  It also defies belief that the City, which claims now it was not a sophisticated investor, would somehow have foreseen the coming financial collapse—which so few investors in quite literally the entire world anticipated—and would have terminated the Swap in time to earn a positive settlement amount.

## II.   The Facts that Form the Bases of the City's Claims for Fraudulent Inducement and Negligent Misrepresentation Were Disclosed (Counts V and VI)

As the Court noted at the hearing, the City was required to plead an "omission of true information."  Tr. 42:10; *see also* Tr. 53:18-19 ("the City must show that the information was withheld"); *Chrysler Credit Corp. v. Whitney Nat'l Bank*, 824 F. Supp. 587, 598 (E.D. La. 1993) (plaintiff must allege with particularity "the information that was withheld"); *Shelton v. Standard/700 Assocs.*, 798 So. 2d 60, 64 (La. 2001).  To that end, the City alleged the failure to disclose three facts: "(1) the catastrophic risks for issuers arising from the structure recommended by UBS; (2) the conflicts of interest resulting from the structure of the transaction; and (3) PWCSI's secret Reciprocal Swap with AFS."  Opp. at 23-24.  In its verbal ruling

disposing of Ambac's motion to dismiss, the Court specifically—and correctly[9]—held that the City was well aware of each of these facts.  Moreover, as to the Reciprocal Swap, the City cannot claim it was unaware of Ambac's rights regarding the Swap because the City consented to § 10 of the Reciprocal Swap via § 7(c) of the Swap.  For these reasons, the City's fraud and misrepresentation claims must be dismissed.

Regarding the Reciprocal Swap, as explained above, the City "acknowledge[d] and consent[ed]" to the granting of rights that occurred in § 10 of the Reciprocal Swap.  Ambac's rights regarding the Swap via the Reciprocal Swap thus were not omitted.  And, once the City knew about Ambac's rights, any lack of knowledge about the hedging aspect of the Reciprocal Swap became irrelevant because the City's complaint is about Ambac's alleged control over the Swap.  *See* ¶¶ 90-91.  At the very least, that acknowledgement and consent placed the City on inquiry notice of the Reciprocal Swap and Ambac's rights; accordingly, these claims have prescribed.  *See* Mem. at 29-30, 32; Reply [Dkt. No. 104] at 6.  Moreover, this Court has already stated that the City was at least on notice of the Reciprocal Swap:  "the Court finds that the 1999 10-K specifically disclose[s] the fact that AFS participated in such Swap Agreements. . . . The City knew that PWCSI may enter [in]to a Reciprocal Swap Agreement with AFS."  Tr. 48:19-23.  Accordingly, the City's claims cannot proceed on the basis of the alleged nondisclosure of the Reciprocal Swap.

As to the risks from the structure, the Court held: "the City, through its many financial advisors and attorneys, was well aware of the risks of the structure.  Again, the City itself warned its investors of the same risks about which it now complains."  Tr. 49:5-8.

---

[9] Defendants detailed before why the documents and the City's own allegations show that it knew of all these facts. *See* Mem. at 24-26; Reply at 4-5.

As to the alleged conflicts of interest resulting from the structure, the Court stated: "[T]he structure was set forth in the documents that the City itself negotiated and executed, including the [Ambac] Policy itself.  Thus, the City had all the information at its disposal to evaluate any such conflicts [of interest]."  Tr. 49:15-19.

The City cannot have been aware of these facts (for claims against Ambac) and unaware of them (for claims against UBS and PWCSI) at the same time.  Yet to allow the City's fraudulent inducement and negligent misrepresentation claims to proceed, the Court must hold that these facts were not disclosed.  Because the Court has already found that each material fact was not omitted, the City's claims must fail.

## III.    The City Conceded Its Fraud and Negligent Misrepresentation Claims Against PWCSI

In their Memorandum, the UBS Defendants argued that the non-fiduciary, non-reliance clauses of the transaction documents preclude fraud and misrepresentation claims against UBS and PWCSI.  *See* Mem. at 23-24.  The City's Opposition in response conceded that these disclaimer provisions bar its claims against PWCSI.  *See* Opp. at 28 (conceding that the "non-reliance and nonfiduciary clauses appear in the PWCSI-City Swap Agreement[] . . . [and] apply only to the Swap and PWCSI").  The claims against PWCSI thus should be dismissed, even if those against UBS are not.

## <u>CONCLUSION</u>

For the reasons stated above, reconsideration of the Court's October 14 decision is warranted, and the City's claims should be dismissed.

21

Respectfully submitted,

*/s George C. Freeman, III*

**BARRASSO, USDIN, KUPPERMAN, FREEMAN & SARVER, LLC**
George C. Freeman, III, Louisiana Bar No. 14272
Stephen H. Kupperman, Louisiana Bar No. 17890
Meredith Cunningham, Louisiana Bar No. 26465
909 Poydras Street, Suite 2400
New Orleans, LA 70112
504-589-9700

**FRESHFIELDS BRUCKHAUS DERINGER US LLP**
Walter B. Stuart, Louisiana Bar No. 12551
520 Madison Avenue, 34th Floor
New York, NY 10022
212-230-4650

**VINSON & ELKINS LLP**
David R. Woodcock, Jr.
Douglas D. Geyser
The Terrace 7
2801 Via Fortuna Drive
Austin, TX 78746
512-542-8637

**VINSON & ELKINS LLP**
Kenneth P. Held
First City Tower
1001 Fannin Street
Suite 2500
Houston, TX 77002-6760
713-758-4353

**VINSON & ELKINS LLP**
Paul S. Maco
The Willard Office Building
1455 Pennsylvania Avenue, NW
Washington, DC 20004-1008
202-639-6500

**COUNSEL FOR UBS SECURITIES LLC AND PAINEWEBBER CAPITAL SERVICES, INC.**

## <u>C E R T I F I C A T E</u>

I hereby certify that on November 10, 2010, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all non-CM/ECF participants.

_s/ George C. Freeman, III_