UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| THE CITY OF NEW ORLEANS | * | |
| | * | |
| Plaintiff, | * | CIVIL ACTION NO. 08-3949 |
| | * | |
| | * | SECTION "N" (1) |
| VERSUS | * | |
| | * | JUDGE KURT D. |
| | * | ENGELHARDT |
| AMBAC ASSURANCE CORPORATION, | * | |
| AMBAC FINANCIAL SERVICES, LLC, | * | MAGISTRATE JUDGE |
| PAINEWEBBER CAPITAL SERVICES, | * | SALLY SHUSHAN |
| INC., AND UBS SECURITIES LLC | * | |
| | * | |
| Defendants | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * *

PRE-TRIAL ORDER

I.  PRE-TRIAL CONFERENCE DATE

The pre-trial conference was held on February 12, 2015 at 10:00 a.m.

II.  APPEARANCE OF COUNSEL

1.  *Attorneys for Plaintiff*

JAMES R. SWANSON, T.A. (#18455)
JASON W. BURGE (#30240)
REBECCA SHA (#35317)
FISHMAN HAYGOOD PHELPS WALMSLEY
WILLIS & SWANSON, L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
jswanson@fishmanhaygood.com
jburge@fishmanhaygood.com
rsha@fishmanhaygood.com

- 1 -

759294v.2

GLADSTONE N. JONES (#22221)
HARVEY S. BARTLETT III (#26795)
CATHERINE E. LASKY (#28652)
KERRY A. MURPHY (#31382)
**JONES, SWANSON, HUDDELL & GARRISON, L.L.C.**
601 Poydras Street, Suite 2655
New Orleans, Louisiana 70130
Telephone: (504) 523-2500
Facsimile: (504) 523-2508
gjones@jonesswanson.com
tbartlett@jonesswanson.com
klasky@jonesswanson.com
kmurphy@jonesswanson.com

ALEXANDRA E. MORA (#23535)
WALTER WOLF (#21953)
**LAW OFFICE OF ALEXANDRA MORA**
322 Lafayette Street
New Orleans, Louisiana 70130
Telephone: (504) 566 0233
Facsimile: (504) 566 8997
amora@moralawfirm.com

SHARONDA R. WILLIAMS (#28809)
E. PATRICK EAGAN (#34848)
**City of New Orleans**
**Law Department**
1300 Perdido Street, 5th Floor
New Orleans, Louisiana 70112
shrwilliams@nola.gov
epeagan@nola.gov

2.      *Attorneys for Defendant PaineWebber Capital Services, Inc. ("PWCSI" or*
        *"Defendant")*

George C. Freeman, III
**BARRASSO, USDIN, KUPPERMAN, FREEMAN & SARVER, LLC**
909 Poydras Street, Suite 2400
New Orleans, LA 70112
Telephone: 504-589-9700
Facsimile: 504-589-9932
gfreeman@barrassousdin.com

Charles A. Gilman (*Pro Hac Vice*)
Tammy Roy (*Pro Hac Vice*)
John A. Eakins (*Pro Hac Vice*)
**CAHILL GORDON & REINDEL LLP**

2

80 Pine Street
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
cgilman@cahill.com
troy@cahill.com
jeakins@cahill.com

Walter Stuart
Jason Powers (*Pro Hac Vice*)
Amy Tankersley (*Pro Hac Vice*)
**VINSON & ELKINS LLP**
First City Tower
1001 Fannin Street
Suite 2500
Houston, TX 77002-6760
Telephone: 713-758-1086
Facsimile: 713-615-5018
wstuart@velaw.com
jpowers@velaw.com
atankersley@velaw.com

## III.  DESCRIPTION OF THE PARTIES

*For Plaintiff*

The City of New Orleans is a political subdivision of the State of Louisiana, established

by the Home Rule Charter of the City of New Orleans.

*For Defendant Paine Webber Capital Services, Inc.*

PWCSI is a corporation chartered under the laws of Delaware with its principal place of

business in Weehawken, New Jersey.

## IV.  JURISDICTION

This Court has jurisdiction over the state law breach of contract claim pursuant to 28

U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and

costs, and the City, as Plaintiff, is a citizen of Louisiana and Defendant PWCSI is a citizen of a

state other than Louisiana.

3

759294v.2

V.   **PENDING MOTIONS**

*None*

VI.   **SUMMARY OF MATERIAL FACTS**[1]

*Claimed by Plaintiff*

This dispute relates to bonds issued by the City of New Orleans in December 2000 to fund its pension obligations for firefighters. The financing plan was to borrow $170 million, invest the proceeds, and use the investment earnings to pay the City's pension obligations.

UBS banker Clay Armbrister solicited the City of New Orleans for a bond transaction as a result of Armbrister's college relationship with Mayor Morial. Armbrister was not assigned to this region for UBS, but solicited his former college classmate as a result of that relationship. UBS worked with the City closely for approximately 18 months to structure the bond transaction.

The original deal proposed by UBS in early 2000 called for the City to issue traditional fixed rate bonds, which the City had always used for previous bond issuances. Less than two months before the scheduled closing of the bonds, UBS's derivatives desk, headed by Peter Ghavami, suggested to Clarence Armbrister that UBS recommend a synthetic fixed-rate transaction with an interest rate swap to the City. In October 2000, UBS changed its proposed structure and recommended the City issue bonds in a synthetic fixed-rate structure, which required the City to issue variable-rate bonds coupled with an interest rate swap. As part of this synthetic structure, the City entered into a "cost of funds" swap with PWCSI, a UBS affiliate,

---

[1] These Summaries of Material Fact were prepared and submitted separately by the City and the Defendants. All parties expressly reserve and do not waive any evidentiary or other objections, including but not limited to relevancy, hearsay and Federal Rule of Evidence 408, to the information contained therein.

759294v.2

through which the City would pay a fixed amount and PWCSI, as the counterparty, would pay the City the amount it would owe on its bonds. One important feature of a "cost of funds" swap was that it gave PWCSI the option, upon certain conditions, to convert the swap payments to LIBOR, at which point the City would no longer receive the amount it would owe on its bonds. If the Swap was converted, the deal proposed by UBS would fail.

On November 16, 2000, about two weeks before the City entered into the interest rate swap, PWCSI and the City entered into an ISDA Master agreement in which PWCSI agreed to obtain the City's consent before transferring any interest in or under the City's swap to a third party. This court has previously stated that the purpose of this provision was to give the City the opportunity to exercise its option and terminate the transaction before any transfer occurred.

PWCSI has conceded that it did not disclose to the City that PWCSI was only interested in participating in the synthetic transaction because pursuant to a preexisting agreement, PWCSI would immediately execute a Reciprocal Swap with AFS, an affiliate of the City's bond insurer, which would eliminate PWCSI's risk as the City's counterparty and lock in immediate profit for PWCSI. As a result of the transfer of the swap, PWCSI stood to make a $1 to $2 million risk-free profit by serving as middleman between the City and Ambac. On the same date as the swap between PWCSI and the City, PWCSI entered into a Reciprocal Swap with AFS, an Ambac affiliate, pursuant to a "joint venture" between PWCSI and Ambac that dated to October 27, 1999. The Reciprocal Swap was unlike a typical hedge, because through the Reciprocal Swap, PWCSI assigned to Ambac various contractual rights under PWCSI's swap with the City. These rights included that PWCSI would not exercise any right under the swap without prior written consent of Ambac and that PWCSI would exercise any right under the swap at the direction of Ambac. The Reciprocal Swap meant that the City's swap was at Ambac's mercy, and Ambac

5

was a party with very different interests than PWCSI. As an insurer, Ambac received a pre-paid $6 million premium to guarantee the City's payments for 30 years. Ambac had an interest in forcing the City to refinance to earn immediately all non-accrued premium. This conflict would have been readily apparent to the City and Bond Commission decision-makers had UBS provided notice of its intent.

Although the City's swap contract with PWCSI required that PWCSI obtain the City's consent before transferring any interest in the Swap to a third party, PWCSI never did. On November 30, 2000, Ghavami sought final approval from senior UBS personnel of the swap transaction with the City and the proposed transfer of the Swap rights to Ambac, but he never sought the approval of the City. From November 16, through November 30, none of the UBS employees who dealt with the City knew about the transfer. Ghavami and his group never told the City or the UBS employees who dealt with the City about the joint venture or the planned transfer. UBS represented to the City, both in marketing materials and in the swap confirmation, that it would be a "principal" in any swap transaction with the City; it never corrected that statement. UBS made a presentation to the State Bond Commission to obtain approval for the Bonds, but no UBS employee told anyone at the Bond Commission about the joint venture or the transfer. John Kennedy was the Bond Commission chairman, and he was never informed of the joint venture or the transfer. Had the City been given prior notice of the Reciprocal Swap, it would have withheld consent and would not have executed the swap or the synthetic fixed-rate bond deal. The City has previously canceled approved deals, such as a planned Swap in 2004, when the City learns that its consultants or business partners are earning outrageous fees, such as the fees UBS earned here.

759294v.2

UBS also did not disclose that the synthetic fixed rate structure was substantially more lucrative for PWCSI and UBS as they stood to make approximately six times more revenue than under a traditional fixed rate structure, including the profit that it made from the Reciprocal Swap by serving as nothing more than a middleman. Had the City known of these facts, it would not have issued the bonds as structured.

In February 2008, the City suffered massive damages when Ambac exercised its rights under the Reciprocal Swap to declare a "market disruption" under PWCSI's swap with the City, switching the swap from cost of funds to LIBOR. Ambac ordered PWCSI to declare the market disruption, and PWCSI did so. Although the contract required consultation with the City prior to declaring a market disruption, the City was never consulted until after the disruption had been declared. It was at this moment that the City learned of the Reciprocal Swap and that PWCSI had transferred its rights under the City's swap to Ambac. As a result of the conversion, the City's monthly debt payments on the bonds skyrocketed adding approximately $5 million per year to the City's debt payments. Because UBS ceased remarketing the variable-rate bonds shortly after Ambac declared the market disruption, the City was forced to refinance the 30-year issuance within the next five years. Ultimately, the City refinanced the bonds in 2012 and terminated the swap at the cost of approximately $45 million.

### *Claimed by Defendant*

#### *Liability*

The City and PWCSI entered in a Swap Agreement (comprised of a Master ISDA Agreement, the Schedule thereto, and a Confirmation with a trade date of December 1, 2000). There is no dispute that the Swap Agreement is a valid and enforceable agreement.  In the Schedule, the parties agreed to seven pages of modifications to the Master Agreement added

7

specifically because both the City's and PWCSI's payment obligations were insured by Ambac

Assurance.  The parties agreed to amend Section 7 of the Master Agreement to provide:

"Transfer.

(a) "Except as expressly provided herein, **neither this Agreement nor any interest or obligation** in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, **except that**:

> (i) "a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement);

> (ii) "a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

> (iii) "a party may transfer **this Agreement and all of its rights and obligations hereunder** with respect to any or all Transactions to any of its Affiliates or to any Affiliate of the PWCSI Surety Provider [AMBAC] without the consent of the other party provided that the other party is furnished with (A) an agreement in writing of any Credit Support Provider of the transferor that any Credit Support Document will continue to apply to the obligations of such transferee under this Agreement after such transfer, or (B) a financial guaranty comparable to the PWCSI Surety Provider and that no such transfer may occur unless the following conditions shall have been met:

>> (1) "**the transferee accepts and assumes all of the transferor's obligations under this Agreement** and any Transaction being transferred;

>> (2) "the transferring party shall give the other party and the PWCSI Surety Provider **prior written notice of any transfer of the Agreement or any Transaction; and**

>> (3) "a Potential Event of Default, an Event of Default or a Termination Event does not occur as a result of such transfer. . . . (emphasis added)

The only place in the Transfer section of the Swap Agreement where any requirement of

"notice" appears is in the above-quoted provision, which by its terms relates only to where there

is a transfer of "this Agreement and all of its rights and obligations."  The City has never alleged

8

that PWCSI transferred the Swap Agreement "and all of its rights and obligations." The City alleges that PWCSI breached Section 7(a)(iii)(2) because it did not provide prior written notice that it would enter into a Reciprocal Swap (which is comprised of a Master Agreement, Schedule, and Confirmation between Ambac Financial Services ("AFS") and PWSCI). PWCSI does not dispute that it provided no notice of the Reciprocal Swap because no notice was ever required. The City has never alleged and cannot prove (as the City's own Swap Advisor admits that the Reciprocal Swap does not represent) a transfer of the "[Swap] Agreement **and all** of its rights and obligations." The City has never alleged and cannot prove any of the other three conditions under Section 7(a)(iii), in particular that AFS accepted and assumed "**all of**" PWCSI's obligations under the Swap Agreement.

The most the City contends (which PWCSI disputes) is that the Reciprocal Agreement transferred "control rights" in Section 10 of the Confirmation between AFS and PWCSI. First, Section 10 did not give AFS any ability to act unilaterally to enforce any provision of the Swap Agreement. Rather, it could only direct PWCSI to take an action, which is a contract right between AFS and PWCSI – not a "transfer" of any of the Swap Agreement or any interest or obligations between PWCSI and the City. Second, even were Section 10 of the Reciprocal Swap Agreement the transfer of an interest, in other parts of the Swap Agreement, the City expressly consented to granting such rights to Ambac. *See* Swap Agreement, Schedule, Appendix 1 at:

Section (q)(c):     "[The City] hereby acknowledges and consents to the assignment by PWCSI to [Ambac] or any rights and remedies that PWCSI has under any Insured Transaction or any other document executed in connection herewith."

Section (l):        "PWCSI and [the City] hereby acknowledge and agree that (a) [Ambac] shall be a third party beneficiary under any Insured Transaction and any Credit Support Document of PWCSI, entitled to enforce its rights thereunder. . . ."

759294v.2

Section (o):       "[The City] hereby acknowledges that it has been advised by PWCSI that PWCSI has pledged its rights to receive payments under this Agreement . . . and under any or all other swap agreements entered into or to be entered into by PWCSI . . . for the benefit of [Ambac, the City] and counterparties under such other swap agreements. . . ."

PWCSI's failure to provide notice that is nowhere in the Swap Agreement required to be provided, and as to which the City had already given its written consent, cannot be a breach of the Swap Agreement. The City's proof of breach fails. Judgment should be entered in favor of PWCSI on Count VIII.

### *Damages*

As of 1999, the historic pay-as-you-go basis on which the City honored its pension obligations to its firefighters presented a half century or more of future payments that burdened the City and was something that the firefighters wanted changed. G.S. Curran & Co., actuaries for the Firefighters Pension & Relief Fund, recommended prefunding of the firefighters' pension plan because: "Without asset accumulation, payments by the City of New Orleans will be required for approximately fifty to sixty years. Prefunding can reduce this period of commitment to between fourteen and thirty years, depending on the plan adopted. It should be noted that prefunding and asset accumulation provide cost reductions to the employer, but more importantly, improved benefit security for the recipients [*i.e.*, the firefighters]." The City Council had fiduciary duties to the City and to its residents, and the Mayor and Council wanted budgetary relief in the current and near years. The City also had pension obligations to the firefighters and the firefighters demanded that those obligations be funded.

On July 20, 2000, the City Council preliminarily approved to proceed with a taxable bond issuance, resolving that "[t]he details of the bonds and any interest rate swap or forward rate agreement shall be established by subsequent resolutions adopted by this Council." On November 16, 2000, the City Council resolved to proceed with a synthetic fixed rate taxable

10

bond issuance, which the State Bond Commission approved on November 30, 2000.   In connection with its approved bond issuance, the City entered into a Swap Agreement with PWCSI.   Throughout, the City was represented and advised by the State's preeminent bond counsel (Foley & Judell LLP), and a team of accountants, lawyers and financial advisors, and the proposed bond issuance went through City Council and State Bond Commission hearings and approvals and received judicial validation.   The City's legal advisors reviewed and signed off on the contract documentation relating to the synthetic fixed rate taxable bond issuance, and the disclosure thereof in the City's Official Statement offering the bonds.   The City's financial and swap advisors rendered opinions to the City that the pricing of the Swap Agreement was fair and reasonable and that the business terms of the contract documentation were consistent with market and industry standards.   In the Swap Agreement, the City expressly represented and warranted that it had consulted with its own legal, regulatory, tax, business, investment, financial, and accounting advisors to the extent it deemed necessary and that it had made its own independent decisions to enter into the transaction and was not relying on any communication (written or oral) of PWCSI.   The Swap Agreement is a valid and binding contract between the City and PWCSI.

The bonds issued by the City were insured by Ambac, a AAA-rated insurer among the nation's oldest and largest insurers of municipal bonds.   The City's performance of its obligations to PWCSI under the Swap Agreement was insured by Ambac.   PWCSI's performance of its obligations to the City under the Swap Agreement was insured by Ambac.  Ambac was an express third party beneficiary of the Swap Agreement.   In the Swap Agreement, the City expressly acknowledged that PWCSI had pledged for the benefit of Ambac its rights to receive payment under the Swap Agreement and under any or all other swap agreements entered

into or to be entered into by PWCSI. In the Swap Agreement, the City expressly acknowledged and consented to the assignment by PWCSI to Ambac of any rights and remedies that PWCSI has under the Swap Agreement or any other document executed in connection therewith. These provisions expressly gave Ambac the powers that the City now contends would have been troubling to it, and indeed, contemplated that Ambac could take possession of the entire Swap Agreement without any prior right of consent even if the City were under financial duress. The City never expressed any concern that Ambac's actual possession of these rights or their potential possession of the entire Swap Agreement posed any conflict of interest or created any other risk to which the City was unwilling to face.

At the time of the bond issuance, PWCSI hedged its risk under the Swap Agreement with AFS, an affiliate of Ambac, by means of a Reciprocal Swap Agreement. Such hedge transactions were well-known and commonplace in the industry, and the City's own swap advisor contemporaneously expected such a hedge transaction to be done in this case and saw no issue of conflict in having AFS as the counterparty of PWCSI's Reciprocal Swap Agreement. The Reciprocal Swap Agreement did not provide for any direct rights or obligations as between the City and AFS, and the City's rights vis-à-vis PWCSI under the Swap Agreement remain unchanged. In turn, AFS hedged its risk under the Reciprocal Swap by entering into its own swap agreement with Barclays. Thus, funds paid by the City to PWCSI under the Swap Agreement passed through to AFS under the Reciprocal Swap Agreement and then in turn passed through to Barclays under the third swap agreement. As such, even if the Reciprocal Swap could have created some conflict between Ambac's and the City's economic interests during an exceedingly unlikely set of circumstances, the subsequent Barclays swap removed that

12

conflict, and realigned the City's interest in a successful financing with Ambac's interest in avoiding any risk that the City might default.

Over the ensuing years, interest rates moved and, in October 2004, the City applied to the State Bond Commission to enter into a swap agreement directly with AFS, the same affiliate of Ambac that was counterparty to PWCSI on the Reciprocal Swap Agreement, to take advantage of then current interest rates. In support of the City's application, the City's representative (Meredith Hathorn) stated to the State Bond Commission that for the past four years the City's Swap Agreement with PWCSI "has worked exactly like [the City] planned on having it work." The State Bond Commission approved the City's application to do a direct swap with AFS at the same time that Ambac remained insurer of the Bonds and surety for the performances of both the City and PWCSI under the Swap Agreement. For reasons unrelated to Ambac, the City determined not to proceed with the approved swap with AFS.

In August 2005, Hurricane Katrina caused catastrophic damage to the City, as a result of which the City was forced to borrow hundreds of millions of dollars in relief funds that constrained its balance sheet and resulted in the downgrade of its credit rating. In 2008, the worst financial crisis since the Great Depression gripped the financial markets. The credit default swap market (an indicator of market confidence in the credit of significant debtors) reflected increasing doubts about Ambac's ability to pay its debts, and credit rating agencies put Ambac on negative credit watch. Ultimately, Ambac's parent company suffered a credit rating downgrade and filed for bankruptcy and Ambac itself entered into a state restructuring. As those events unfolded, the City's Bonds became unmarketable. Pursuant to the terms of the Swap Agreement, the Bonds were put to the Liquidity Facility and, without any further remarketing possible, the Remarketing Agent resigned.

13

After the Katrina-related debt burdening the City's balance sheet was forgiven by the federal government, in 2011 the City began the process of refinancing the Bonds. In August 2011, with reference to the demise of Ambac and the financial crisis, the legal representative of the City (Meredith Hathorn) acknowledged: "But for the demise of the bond insurance and general market conditions, the City should have been getting cost of funds." As part of its refinancing of the Bonds, the City signed a Termination Agreement relating to the Swap Agreement between it and PWCSI. Therein, the City and PWCSI made mutual representation to each other that: "Each party is acting for its own account, and it has made its own independent decisions to terminate this Transaction . . . . Each party is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction; it being understood that information and explanation related to the terms and conditions of this termination shall not be considered investment advice or a recommendation to enter into this termination. . . . (b) Each party is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of the termination of this Transaction. . . (c) Neither party is acting as a fiduciary for or as an advisor to the other in respect of this Transaction."

With the full benefit of hindsight, the City does not claim that PWCSI in any way caused: Hurricane Katrina in August 2005; or the downgrade of the City's credit rating to below investment grade in 2005; or substantial amounts of Katrina-related relief funds to be accounted for by the City as debt; or the financial crisis in 2008 and its impact on monoline insurers such as Ambac; or the downgrade of Ambac's credit rating in 2008; or the financial failure of Ambac in 2010; or the City's inability because of Katrina-related debt to refinance the Bonds until 2012; or

14

the City's failure to earn a sufficient rate of return to pay for the Bonds from its investment of the proceeds from the initial sale of the Bonds from 2000 through 2008.

Whether or not there was a Reciprocal Swap Agreement, the events that occurred in the years subsequent to the City's bond issuance would have occurred and those events were acts of God and market for which PWCSI is not liable. PWCSI would have acted as it did in 2008 even if there were no Reciprocal Swap Agreement. Thus, the City cannot meet its burden to prove damages that are legally cognizable under New York law for breach of contract. Moreover, the City's damages models do not estimate any damages that are recoverable under New York law, because those models do not estimate damages that (i) would have been within the reasonable contemplation of the parties at the time of contracting, (ii) would have been foreseeable and probable results of a breach of the relevant provisions, (iii) are shown with reasonable certainty, or (iv) proximately caused by the alleged breach.

PWCSI did not breach its contractual obligations to the City under the Swap Agreement. There is no evidence that any putative breach caused any damage to the City or resulted in any change of position by any party. PWCSI is entitled to judgment on the sole claim remaining.

## VII.   <u>UNCONTESTED MATERIAL FACTS</u>

*See* Appendix A hereto.

## VIII.   <u>CONTESTED ISSUES OF FACT</u>

1.     By Plaintiff – *see* Appendix B-1 hereto.

2.     By Defendant – *see* Appendix B-2 hereto.

IX.   **CONTESTED ISSUES OF LAW**

*Claimed by Plaintiff*

1.   Whether PWCSI had a contractual obligation under the terms of the Swap Agreement to disclose to the City the transfer of its contractual rights under the Swap to AFS through the Reciprocal Swap.

2.   Whether PWCSI breached its contractual obligations to the City under the Swap Agreement by failing to disclose to the City the transfer of its contractual rights under the Swap to AFS.

3.   Whether PWCSI transferred its rights to AFS as defined in the Swap Agreement between PWCSI and the City.

4.   Whether PWCSI's breach of the Swap Agreement caused damages to the City.

5.   The appropriate amount of damages to put the City in as good a position as it would have PWCSI provided the notice required under the Swap Agreement.

6.   Whether the alternative financing scenarios contemplated by the parties at the time of the breach of the notice provision, including the already approved traditional fixed-rate bond issuance, show the value of the notice that PWCSI failed to provide; where the New York Appellate Division has recently confirmed that a breach of a notice provision may underlie a finding of "direct" damages, and that value of the notice was in the ability of the party who should have been notified to protect their interests. *Mill Fin., LLC v. Gillett*, 122 A.D.3d 98, 103-04 (N.Y. App. Div. 2014). Courts applying New York law to cases where damages arise from a failure to give notice will look to the contemporaneous evidence of "what would most probably have occurred" if the required notice had been given,

16

and will not treat such evidence as *per se* "speculative." *Commonwealth Assocs. v. Palomar Med. Technologies, Inc.*, 982 F.Supp. 205, 208-11 (S.D.N.Y. 1997).

### Claimed by Defendant

7.    The Reciprocal Swap Agreement, including Section 10 thereof, did not "transfer" any "interest" in or "obligation" under the Swap Agreement.

8.    The Reciprocal Swap Agreement, including Section 10 thereof, did not transfer any rights or remedies under the Swap Agreement, because PWCSI retained its rights and remedies.

9.    The Reciprocal Swap Agreement, including Section 10 thereof, did not provide AFS any rights against the City.

10.    The Reciprocal Swap Agreement, including Section 10 thereof, did not provide AFS with a perfected security interest in the Swap Agreement, but if it did any contract term restricting any such interest is ineffective pursuant to New York Uniform Commercial Code § 9-318 (as in effect during the relevant time period).

11.    Assuming arguendo that Section 10 of the Reciprocal Swap Agreement constituted a breach of the Swap Agreement, pursuant to the terms of the Swap Agreement Section 10 of the Reciprocal Swap Agreement would be "void" and PWCSI would have all rights and remedies under the Swap Agreement and therefore the City suffered no injury as a matter of law.

12.    Assuming arguendo that Section 10 of the Reciprocal Swap Agreement was the transfer of an interest in the Swap Agreement to AFS, other parts of the Swap Agreement, *i.e.,* Swap Agreement, Schedule, Appendix 1 at Section (q)(c), (l) and (o), constituted the prior written consent by the City to the transfer.

13.    The actions or inactions of PWCSI are not the legal cause of any injury to the City.

14.    The City has no damages legally cognizable for breach of contract under New York law.

15.    Whether the damages alleged are properly recoverable direct or consequential damages within the reasonable contemplation of the parties at the time of contracting, reasonably foreseeable, and proximately caused by the alleged breach.

16.    Whether the breach of contract damages claimed by the City are speculative or otherwise insufficiently certain to be recoverable under New York law.

17.    Whether any of the City's damages scenarios comport with the governing law of New York, which as stated by New York's highest court provides:

> "Money damages are substitutional relief designed in theory "to put the injured party in as good a position as he would have been put by full performance of the contract, at the least cost to the defendant and without charging him with harms that he had no sufficient reason to foresee when he made the contract." (5 Corbin, Contracts, § 1002, pp. 31-32; 11 Williston, Contracts [3d ed.], § 1338, p. 198.)  In other words, so far as possible, the law attempts to secure to the injured party the benefit of his bargain, subject to the limitations that the injury – whether it be losses suffered or gains prevented -- was foreseeable, and that the amount of damages claimed be measurable with a reasonable degree of certainty and, of course, adequately proven. (*See, generally, Dobbs, Law of Remedies*, p. 148; *see, also*, Farnsworth, *Legal Remedies for Breach of Contract*, 70 Col. L. Rev. 1145, 1159.)  But it is equally fundamental that the injured party should not recover more from the breach than he would have gained had the contract been fully performed. (*Baker* v. *Drake*, 53 N. Y. 211, 217; *see, generally*, Dobbs, *Law of Remedies*, p. 810.)."

*Freund* v *Washington Sq. Press*, 34 N.Y.2d 379, 382, 314 N.E.2d 419, 420-21 (N.Y. 1974).  *See also Terwilliger* v. *Terwilliger*, 206 F.3d 240, 248 (2d Cir. 2000) (same, applying New York law).  The only breach alleged by the City is a

failure to give notice.  As the Second Circuit recently observed in *Andrews* v.

*Sotheby International Realty, Inc.*, 586 Fed. Appx. 76, 77 (2d Cir. Dec. 5, 2014)

(applying New York law):

> "But notice provisions are not, without more, equivalent to liquidated damages clauses, and do not discharge a plaintiff's duty to mitigate. Here, Andrews fully mitigated his damages by obtaining employment under the same terms, and is therefore not entitled to any further relief. *See Freund* v. *Washington Square Press, Inc.*, 34 N.Y.2d 379, 382, 357 N.Y.S.2d 857, 314 N.E.2d 419 (1974) ("Money damages are substitutional relief designed in theory to put the injured party in as good a position as he would have been put by full performance of the contract, at the least cost to the defendant and without charging him with harms that he had no sufficient reason to foresee when he made the contract.") (internal quotation marks omitted).

18.   Whether Plaintiff took reasonable actions to mitigate any alleged damages.

## X.   EXHIBITS

### 1.   Exhibits Parties Stipulate May be Introduced at Trial by Any Party

*Attached as Appendix C-1*

### 2.   Plaintiff City of New Orleans' Exhibits Intended to be Introduced at Trial Objected to by Defendant

*Attached as Appendix C-2*

### 3.   Defendant's Exhibits Intended to be Introduced at Trial Objected to by Plaintiff

*Attached as Appendix C-3*

*Except for the transcripts designated in Appendices D-1 and D-2, Plaintiff and Defendant object to the use of deposition transcripts for any purpose other than impeachment or rebuttal. Plaintiff and Defendant also object to the use of any party's own discovery responses in lieu of presenting testimony or evidence at trial.*

## XI.   DEPOSITION TESTIMONY

### 1.   Deposition Testimony to be Presented by Plaintiff

19

759294v.2

*Attached as Appendix D-1*

2.   **Deposition Testimony to be Presented by Defendant**

*Attached as Appendix D-2*

*All parties reserve their rights to use any or all portions of deposition testimony to impeach or rebut any witness' testimony at trial.*

## XII.   CHARTS, GRAPHS, ETC.

1.   **For Plaintiff**

Plaintiff intends to have a PowerPoint presentation describing parties and claims at issue, to be used in opening argument, including display of unobjected-to key documents as well as charts and/or other forms of pictorial display concerning the City's Bond issuance, the timelines of relevant events and the City's damages.

2.   **For Defendant**

Defendant intends to have charts, graphs and/or other forms of pictorial display concerning the City's Bond issuance and the several agreements and component parts and parties relating thereto, as well as one or more timelines of the relevant events.

*The parties agree to submit all such charts, graphs, etc. to opposing counsel at least two working days prior to use at trial and, if there is then opposition to their use, the dispute will be submitted to the Court before any use thereof at trial.*

## XIII.   WITNESSES

*The following listed witnesses were filed in accordance with the Federal Rules of Civil Procedure and all prior court orders. With regard to all listed expert witnesses, the undersigned counsel certify that they have exchanged expert reports as required by the Federal Rules of Civil Procedure and all prior court orders.*

### 1.   Plaintiff Intends to Call the Following Witnesses at Trial:

a.   John Kennedy
Through counsel for the City of New Orleans

20

Fact witness to testify regarding the facts and circumstances relating to the Bond Transaction, including but not limited to the presentations and representations made to the State Bond Commission about the Transaction; the proceedings before the State Bond Commission related to the 2000 Transaction; and the role of the State Bond Commission in approving proposed bond transactions for municipalities in Louisiana.

b.    Milton Brown
      Through counsel for PWCSI

Fact witness to testify regarding the facts and circumstances relating to the Swap and Reciprocal Swap, including but not limited to the derivatives desk at UBS in 2000; the swap between PWCSI and the City; the joint venture between Ambac and PWCSI; and the Reciprocal Swap and UBS/PWCSI's failure to disclose same to the City.

c.    Peter Ghavami (by deposition)

Fact witness to testify about the facts and circumstances relating to the Bond Transaction, including but not limited to, the switch of the City bond structure from a fixed rate to synthetic issuance, the structure of the swap between PWCSI and the City, the Reciprocal Swap between Ambac and PWCSI, the October 1999 agreements between Ambac and PWCSI and the relationship between PaineWebber/UBS and PFM.

d.    Jeff Pearsall (by deposition)

Fact witness to testify about the facts and circumstances relating to the Swap and Reciprocal Swap.

e.    Cedric Grant
      Through counsel for the City of New Orleans

Fact witness to testify regarding the facts and circumstances relating to the Bond Transaction, including but not limited to the initial structuring of the Bonds as a fixed rate issuance, PWCSI's failure to disclose and give the City written notice of the Reciprocal Swap and the options available to the City in 2000 for the funding of the Firefighters' Pension Fund.

f.    Troy Carter
      Through counsel for the City of New Orleans

Fact witness to testify regarding the facts and circumstances relating to the Bond Transaction, including but not limited to the initial structuring of the Bonds as a fixed rate issuance, that the Reciprocal Swap was not disclosed to the City

21

Council and the options available to the City in 2000 for the funding of the Firefighters' Pension Fund.

g.  Andrew Kopplin
    Through counsel for the City of New Orleans

Fact witness to testify regarding the facts and circumstances relating to the Bond Transaction, including but not limited to the damages suffered by the City as a result of the 2000 Bond Transaction and the City's attempts to mitigate those damages, including but not limited to refinancing efforts.

h.  John Tsigakos (by deposition)

Ambac and Ambac Financial Services ("AFS") employee and representative who will testify regarding the Ambac/Ambac Financial Services structure, Ambac and AFS's interest rate swap business, the joint venture between Ambac and PWCSI, the Swap, and the Reciprocal Swap.

i.  Bruce Mattaway (by deposition)

Fact witness and Ambac employee and representative who will testify regarding Ambac's role providing bond insurance and credit enhancement services to the City in connection with the 2000 Bond Transaction.

j.  Margaret Lezcano (by deposition)

Fact witness who is a former employee of UBS to testify regarding the relevant events in 2008, including but not limited to the declaration of the rate change event by Ambac and PWCSI and UBS' communications with the City of New Orleans.

k.  Michael Bartolotta
    Through counsel for the City of New Orleans

Expert witness who will testify about the fixed rate structure, the swap, the Reciprocal Swap and the damages sustained by the City.

The City also reserves the right to call any necessary fact witnesses in rebuttal to any information raised in the defendant's case in chief.

2.  **Defendant's Witnesses:**

| Name & Address | Will/May Call | Expected Testimony |
| --- | --- | --- |
| Milton Brown | Will call (live or | *Fact witness*: Testimony concerning: |

| 1285 Ave. of the Americas New York, NY 10019 | by deposition) | financing for municipal pension obligations and PaineWebber's capability and expertise with respect thereto; communications within UBS and PWCSI, with Ambac or its affiliates, and with the City and its fiscal, legal, financial and swap representatives and advisors from inception through issuance of the bonds, relating to the City's objectives with respect to financing of the city's pension obligations to its firefighters, including, without limitation, possible financing structures and the advantages, disadvantages and risks associated therewith; and the bond issuance with respect to which the City Council determined to proceed that was approved by the State Bond Commission and validated in a judicial judgment, and the roles of the parties associated therewith, and the swap agreements associated therewith, and possible testimony in rebuttal to Plaintiff's evidence. |
| --- | --- | --- |
| Jeffrey Pearsall Two Logan Square 18th & Arch Sts., Ste. 1600 Philadelphia, PA 19103 | Will call (by deposition) | *Fact witness:* Testimony concerning: PFM's communications with the City, its representatives and its advisors, and with PW, from inception through issuance of the bonds, related to the financing of the Firefighters Pension Fund. |
| Christopher Laursen 555 Thirteenth St. NW Washington, D.C. 20004 | Will call | *Expert witness:*  Testimony concerning: bond financing and swap agreements; risks associated with different financing structures; relevant market conditions in 2007-08; rebuttal to the testimony of Plaintiff's witness Michael Bartolotta and anyone else on behalf of Plaintiff who purports to speak to the issues of market, injury or damages. |
| John Tsigakos One State Street Plaza New York, NY 10004 | May call (by deposition) | *Fact witness:* Testimony concerning: Ambac's or its affiliates' communications with PWCSI and UBS, and with the City, its representatives and advisors, from inception of the bond development through the declaration of a rate change, related to the swap agreement, the insurance |

23

| | | |
|---|---|---|
| | | provisions therein, and the reciprocal swap agreement; the risks associated with the bonds and swap. |
| Margaret Lezcano<br><br>530 East Central Blvd.<br>Unit 1604<br>Orlando, FL. 32801 | May call (by deposition) | *Fact witness:* Testimony concerning: the circumstances attendant to and PWCSI's options under the Swap Agreement including, without limitation, its option to declare a Rate Change event in 2008. |
| Troy Carter (as Fed. R. Civ. P. 30(b)(6) witness)<br><br>650 Poydras St., Ste. 2517<br>New Orleans, LA 70130 | May call (by deposition) | *Fact witness:* Testimony in rebuttal to Plaintiff's evidence. |
| Gary Curran<br><br>10555 N. Glenstone Pl.<br>Baton Rouge, LA 70810 | May call (live or by deposition) | *Fact witness:* Testimony concerning: actuarial and other services relating to pension obligations to the firefighters, including without limitation with respect to the Firefighters Pension Fund; and communications, calculations and computations relevant to the issuance of pension obligation bonds by the City. |
| Norman Foster (as Fed. R. Civ. P. 30(b)(6) witness)<br><br>Room E306, City Hall<br>New Orleans, LA 70112 | May call (by deposition) | *Fact witness:* Testimony in rebuttal to Plaintiff's evidence. |
| Cedric Grant (as Fed. R. Civ. P. 30(b)(6) witness)<br><br>1340 Poydras St., Ste. 1000<br>New Orleans, LA 70112 | May call (by deposition) | *Fact witness:* Testimony in rebuttal to Plaintiff's evidence. |
| Marlin Gusman (as Fed. R. Civ. P. 30(b)(6) witness)<br><br>819 South Broad St.<br>New Orleans, LA 70119 | May call (by deposition) | *Fact witness:* Testimony in rebuttal to Plaintiff's evidence. |
| Andrew Kopplin (as Fed. R. Civ. P. 30(b)(6) witness)<br><br>1300 Perdido St., Ste. 9E06<br>New Orleans, LA 70112 | May call (by deposition) | *Fact witness:* Testimony in rebuttal to Plaintiff's evidence. |
| Bruce Mattaway | May call (by | *Fact witness:* Testimony concerning: |

24

| One State Street Plaza<br>New York, NY 10004 | deposition) | Ambac's communications with PWCSI and UBS, and with the City, its representatives and advisors, from inception through issuance of the bonds, related to the bond transaction, the surety agreements and related Ambac insurance policies thereto. |
|---|---|---|
| Clarence Armbrister<br><br>6440 Overbrook Ave.<br>Philadelphia, PA 19151 | Rebuttal only | *Fact witness:* Testimony in rebuttal to Plaintiff's evidence |
| Rule 30(b)(6) representative – PWSCI | Rebuttal only | *Fact witness:* Testimony in rebuttal to Plaintiff's evidence |
| Rule 30(b)(6) representative – UBS | Rebuttal only | *Fact witness:* Testimony in rebuttal to Plaintiff's evidence |
| Rule 30(b)(6) representative – City of New Orleans | Rebuttal only | *Fact witness:* Testimony in rebuttal to Plaintiff's evidence |

## XIV.  NON-JURY TRIAL

This is a non-jury trial. Proposed findings of facts and conclusions of law set forth in separate documents shall be electronically filed with the Court by 5p.m. on Friday, February 20, 2015, unless specific leave to the contrary is granted by the Court.

## XV.  STATEMENT REGARDING DAMAGES

In recognition of the Court's preference to try issues of quantum separately from liability, the parties are prepared to explore the issue of bifurcation.  It is Plaintiff's position that the issue of liability should not be tried separate from the issue of quantum.  It is Defendant's position that, depending upon Plaintiff's proof, the "just, speedy, and inexpensive determination of [this] action" (Fed. R. Civ. P. 1) may be facilitated by a bifurcation of liability and damages.

## XVI.  OTHER MATTERS THAT MAY EXPEDITE CASE DISPOSITION

A.   Pursuant to Fed. R. Evid. 615, Defendant requests that witnesses (other than Rule 702 expert witnesses) be excluded so that they cannot hear other witnesses'

759294v.2

testimony, and that the parties, their witnesses and counsel be instructed not to disclose the testimony of any witness to any other witness (other than a Rule 702 expert witness) who has not yet completed his/her testimony.

B.   The parties jointly believe that it will facilitate the trial of this action if all agreed and unobjected to exhibits, and all exhibits as to which objections have been overruled, are accepted into evidence at the commencement of trial.

C.   By Order & Reasons dated December 12, 2014 (Doc. 248), the Court granted motions *in limine* filed on behalf of PWCSI and UBS, ordering that "any evidence of the four misrepresentations at issue in these motions is declared inadmissible at trial." (Order & Reasons at 1)  The Court summarized the four misrepresentations at issue and as to which any evidence would be "inadmissible at trial" as follows: "(1) UBS provided false information to the City, which allowed UBS to price the Swap at a considerably higher rate; (2) UBS provided false information regarding the savings that the synthetic fixed rate bonds would achieve; (3) UBS assured the City that its 10.7% rate of return was reasonable; and (4) UBS told the City that it was not entering into a novel deal, but the same kind of deal other municipalities had previously conducted." (Order & Reasons at 2).

1.   Defendant's Position:   The Court has granted summary judgment dismissing Plaintiff's fraudulent inducement (Count 5) and negligent misrepresentation (Count 6) claims.  In the Final Pre-Trial Order, the City has stated positions, listed exhibits and designated deposition testimony that, in whole or in part, concern the subjects that the Court ruled in its December 12, 2014 Order & Reasons are "inadmissible at trial," or are

26

relevant only to the adjudicated fraudulent inducement and negligent misrepresentation claims and therefore out of this action. Plaintiff's continued proffer of inadmissible matter will result in an unduly burdensome trial and is directly contrary to the Court's Order & Reasons and statements at oral argument on February 11, 2015. Additionally, Defendant will be prejudiced as it designated documents and testimony in accordance with the Court's December 12, 2014 Order and as directed following the February 11, 2015 hearing. There is no good reason for the City to burden the trial of this action with documents and testimony that the Court has already held inadmissible at trial. Defendant respectfully requests that the Court (i) order the City to comply with the Court's December 12, 2014 Order & Reasons in statements and conduct at trial; (ii) order the City to comply with the Court's February 11, 2015 rulings granting summary judgment as to Plaintiff's fraudulent inducement and negligent misrepresentation claims and limiting testimony from witnesses Kennedy and Bartolotta consistent therewith and consistent with Federal Rule of Evidence 701, and (iii) order that Defendant's objections to any evidence in derogation of the Court's prior rulings are fully reserved and the failure of Defendant specifically to object to proposed exhibits or testimony, or portions thereof, on the ground of the Court's December 12, 2014 Order & Reasons or from the February 11, 2015 hearing shall not be a waiver thereof. Defendant also requests that the Court direct the City to inform its witnesses of the Court's ruling and that the City be instructed to

759294v.2

abide the Court's prior evidentiary rulings in its statements and conduct at trial.

## XVII.  TRIAL DATE

Trial shall commence on March 2, 2015 at 8:30 a.m. The trial is expected to last five (5) days. This matter was previously set for trial on November 7, 2011 (R. Doc. 117); March 19, 2012 (R. Doc. 145); and September 24, 2012 (R. Doc. 168).

## XVIII. REQUIRED STATEMENTS

This Pre-Trial Order has been formulated after conferences at which counsel for the respective parties have appeared in person. Reasonable opportunity has been afforded counsel for corrections, or additions, prior to signing. Hereafter, this Order will control the course of the trial and may not be amended except by consent of the parties and the Court, or by order of the Court to prevent manifest injustice.

Counsel acknowledge that cell phones, pagers, beepers, and any other electronic communication devices are not allowed in the courtroom, and shall abide by this rule. All counsel shall further notify all clients and his/her witnesses of this rule.

## XIX.  SETTLEMENT

The parties have engaged in both private and court-mandated mediation and have, to date, not been able to resolve their differences.

New Orleans, Louisiana, this _27th_ day of February, 2015.

UNITED STATES DISTRICT JUDGE

759294v.2

Respectfully submitted,

_____

JAMES R. SWANSON, T.A. (#18455)
JASON W. BURGE (#30240)
REBECCA SHA (#35317)
FISHMAN HAYGOOD PHELPS WALMSLEY
WILLIS & SWANSON, L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250

GLADSTONE N. JONES (#22221)
HARVEY S. BARTLETT III (#26795)
CATHERINE E. LASKY (#28652)
KERRY A. MURPHY (#31382)
JONES, SWANSON, HUDDELL & GARRISON, L.L.C.
601 Poydras Street, Suite 2655
New Orleans, Louisiana 70130
Telephone: (504) 523-2500
Facsimile: (504) 523-2508

ALEXANDRA E. MORA (#23535)
WALTER WOLF (#21953)
LAW OFFICE OF ALEXANDRA MORA
322 Lafayette Street
New Orleans, Louisiana 70130
Telephone: (504) 566 0233
Facsimile: (504) 566 8997

AND

SHARONDA R. WILLIAMS (#28809)
E. PATRICK EAGAN (#34848)
City of New Orleans
Law Department
1300 Perdido Street, 5th Floor
New Orleans, Louisiana 70112

**COUNSEL FOR THE CITY OF NEW ORLEANS**

29

BARRASSO, USDIN, KUPPERMAN,
FREEMAN & SARVER, LLC
George C. Freeman, III
909 Poydras Street, Suite 2400
New Orleans, LA 70112
Telephone: 504-589-9700
Facsimile: 504-589-9932
gfreeman@barrassousdin.com

**CAHILL GORDON & REINDEL LLP**
Charles A. Gilman (*Pro Hac Vice*)
Tammy L. Roy (*Pro Hac Vice*)
John A. Eakins (*Pro Hac Vice*)
80 Pine Street
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
cgilman@cahill.com
troy@cahill.com
jeakins@cahill.com

**VINSON & ELKINS LLP**
Walter Stuart
Jason Powers (*Pro Hac Vice*)
Amy Tankersley (*Pro Hac Vice*)
First City Tower
1001 Fannin Street
Suite 2500
Houston, TX 77002-6760
Telephone: 713-758-1086
Facsimile: 713-615-5018
wstuart@velaw.com
jpowers@velaw.com
atankersley@velaw.com

**COUNSEL FOR PAINEWEBBER CAPITAL
SERVICES, INC.**

759294v.2